# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MATTHEW W. HENSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-17-171-SPS |
| | ) |
| COMMISSIONER of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Matthew W. Hensley requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons set forth below, the Commissioner's decision is REVERSED and the case REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was forty-one years old at the time of the administrative hearing (Tr. 37, 177). He has a high school education, vocational training in welding and truck driving, and has worked as a truck driver and plastic welder (Tr. 48, 58). The claimant alleges he has been unable to work since November 21, 2011, due to a traumatic head injury and knee problems (Tr. 211).

**Procedural History**

On April 23, 2015, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85 (Tr. 176-86). His applications were denied. ALJ James Bentley conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated May 17, 2016 (Tr. 20-32). The Appeals Council denied review, so the ALJ's written opinion represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) with frequent, but not constant, handling and fingering bilaterally; occasional balancing, kneeling, stooping, crouching, crawling, and

climbing ramps or stairs; and never climbing ladders, ropes, or scaffolding (Tr. 25). The ALJ also found that the claimant could perform simple tasks and some detailed tasks with routine supervision, and could interact with coworkers and supervisors only on a superficial basis (Tr. 25). Additionally, the ALJ found the claimant required a sit/stand option defined as a temporary change in position from sitting to standing, and vice versa, with no more than one change in position every twenty minutes and without leaving the work station so as to not diminish pace or production (Tr. 25). The ALJ then concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work he could perform in the national economy, *e. g.*, small products assembler, inspector/packer, and conveyor line bakery worker (Tr. 30- 32).

## Review

The claimant contends that the ALJ erred by: (i) failing to support his RFC conclusions with specific references to the evidence in the record, (ii) assessing an RFC that was inconsistent with the evidence, (iii) failing to order an additional consultative mental status examination, (iv) failing to properly analyze his subjective statements, and (v) posing an incomplete hypothetical question to the vocational expert. The Court agrees with the claimant's first contention, and the decision of the Commissioner must therefore be reversed and the case remanded to the ALJ for further proceedings.

The ALJ found that the claimant had the severe impairments of remote history of fibula fracture (in 1995) with open reduction and internal fixation; posttraumatic arthrosis of the left ankle, mild, with symptoms of chronic sprain; knee condition consistent with patellofemoral compression syndrome and lateral patellofemoral subluxation of the

bilateral knees; history of substance abuse; cognitive disorder; and degenerative disc disease of the cervical spine (Tr. 22-23). The medical evidence relevant to this appeal reveals that the claimant was involved in a motor vehicle accident the morning of November 21, 2011 (Tr. 254). Later that day, he presented to the Mercy Hospital Emergency Department and reported pain in his left ankle, left ribs, and chest (Tr. 257). On physical exam, the claimant had normal range of motion in his neck, tenderness in his chest and left ankle, and no tenderness, swelling, or edema in his left lower leg (Tr. 259). An x-ray of the claimant's left ankle taken that day revealed an old, well-healed fracture of the distal shaft of the fibula with a probable previous intramedullary rod "defect" and mild, chronic, degenerative spurring at the tip of the medial malleolus (Tr. 265). The claimant was diagnosed with rib contusion and ankle contusion versus sprain (Tr. 254).

On November 29, 2011, the claimant presented to Dr. David Traub and reported headaches, neck pain radiating to both shoulders, numbness and tingling in both hands, low back pain radiating into his legs, bilateral knee pain, and left ankle pain (Tr. 298). Dr. Traub noted that the claimant's neck and back were painful with palpation, and that there were active myofascial trigger points (Tr. 298). He was unable to fully examine the claimant's knees due to pain, but found crepitus in his left knee (Tr. 298). Dr. Traub assessed the claimant with hyperflexion injury to the neck; blunt trauma to the right and left knee, moderate to severe; low back sprain; and tachycardia with bitemporal wasting (Tr. 298). A December 2011 MRI of the claimant's right knee revealed a small focus of edema in the far medial aspect of the medial tibial plateau of questionable significance, but was otherwise normal (Tr. 299). A December 2011 MRI of the claimant's left knee

revealed a defect in the anterior tibial plateau that appeared to be a sequelae of now removed hardware, but no acute bony pathology; and a mildly thickened, but not increased in signal, patella tendon with anterior signal voids (Tr. 300-01). There was no signal change to suggest acute patellar tendon pathology (Tr. 301).

The claimant presented to Dr. Kris Parchuri, an orthopedic surgeon, on February 2, 2012, and reported knee pain and sensations of "giving way." (Tr. 303-04). As to the claimant's right knee, Dr. Parchuri found no medial line joint pain, no varus or vulgus instability, no ligamentous laxity, no swelling, and full range of motion with some mild crepitus under the patella (Tr. 303). As to the claimant's left knee, Dr. Parchuri found a well healed incision from a previous left tibial rodding, no joint line pain, and no swelling (Tr. 303). He administered cortisone injections to both knees, and assessed the claimant with right knee contusion and left knee sprain secondary to the November 2011 motor vehicle accident (Tr. 303). At a follow-up appointment on March 28, 2012, the claimant reported that the injections provided approximately four days of relief (Tr. 308). Dr. Parchuri recommended an MRI athrogram of the claimant's right knee, the results of which revealed a low grade collateral ligament injury and mild chondromalacia (Tr. 308, 311). By July 2012, the claimant reported that his knee pain had improved and Dr. Parchuri released him from care (Tr. 315).

The claimant next sought care from Dr. Alan Lewis on May 7, 2013 (Tr. 322-24). He reported pain in his knees and pain and weakness in his left ankle (Tr. 322). Physical examination of the claimant's left ankle revealed a "little bit" of joint tenderness, but no gross instability to anterior drawer or talar tilt stress, and no effusion (Tr. 324). The

claimant's knee exam was abnormal bilaterally with visible patellar tilt and quadriceps atrophy particularly in the vastus medialis oblique muscle ("VMO"), more apparent on the left than right (Tr. 324). Dr. Lewis' impression was as follows:

> #1 posttraumatic arthrosis left ankle, mild with symptoms of chronic sprain. There is no appreciable instability, but the patient has functional instability caused by the lack of rehabilitation.
>
> #2 patellofemoral compression syndrome and lateral patellofemoral subluxation, bilateral knees. The fact that this is more apparent on the left is probably due to the previous tibia fracture and lack of full rehabilitation of his left lower [sic] from the muscle mass after that accident. I explained to him that quadriceps strengthening exercises, especially VMO strengthening, should help his patellofemoral symptoms significantly.
>
> At present I see no indication for surgical intervention of the ankle were [sic] either knee. I would recommend a course of physical therapy and reevaluate approximately 6 weeks down the line.

(Tr. 324). Thereafter, the claimant attended five physical therapy sessions between May 17, 2013, and June 4, 2013 (Tr. 327-37). He initially reported his pain was improving, but by June 4, 2013, he indicated that he was experiencing pain with all exercises, was not improving, and could not tolerate hamstring stretching (Tr. 327-36). At a follow-up appointment on June 18, 2013, the claimant reported that he did not have pain all the time, but did have it frequently, and that it was often debilitating (Tr. 344). Dr. Lewis' physical examination was normal (Tr. 344). Dr. Lewis indicated that he did not find a "physical entity" to explain the claimant's left ankle symptoms and that the claimant made some progress with physical therapy (Tr. 344-45).

On August 5, 2013, the claimant established care with Dr. Arden Blough, and reported continued pain in his knees, as well as pain in his head, and behind his left eye

(Tr. 359-61). At this initial visit, Dr. Blough noted the claimant's posterior occiput was tender to palpation; his cervical spine was tender to palpation in the bilateral cervical paravertebral musculature with palpable trigger points and decreased range of motion in all planes; his knees were tender to palpation with full range of motion in all planes, but demonstrated loss of strength (Tr. 360). X-rays of the claimant's cervical spine taken that day revealed mild right spinous process rotation at C5-6 and moderate hypolordosis, but no fractures (Tr. 360). X-rays of the claimant's knees revealed bilateral patellar subluxation (Tr. 360). Dr. Blough assessed the claimant with cervical spine radiculopathy, sprain/strain, and trigger points; cephalgia; and bilateral knee sprain/strain with chondromalacia (Tr. 360). An August 2013 MRI of the claimant's cervical spine revealed borderline narrowing of the central canal to ten millimeters at C3-4, C5-6, and C6-7; a broad-based central protrusion at C3-4; disc bulges at C4-5, C5-6, and C6-7; bilateral neurofoaminal narrowing at C5-6, C6-7, C7-T1; and right-sided neuroforaminal narrowing at C4-5 (Tr. 385). At a follow-up appointment on September 20, 2013, Dr. Blough found diminished range of motion, tenderness, palpable trigger points, and a positive foraminal compression test in the claimant's cervical spine and decreased sensation to monofilament in his hands (Tr. 366-67). As to the claimant's knees, Dr. Blough noted improvement in range of motion, strength, tenderness, and crepitus (Tr. 367). He indicated that the claimant had reached maximum medical improvement from the treatment he had to offer, but recommended a series of cervical epidural steroid injections, and a course of physical therapy to include a cervical stabilization program (Tr. 367).

Dr. Kathleen Ward performed a consultative mental status examination of the claimant on September 12, 2013 (Tr. 388-92). She noted the claimant appeared impaired, was in constant movement, and talked rapidly using both slurred and "amped" words (Tr. 389). She indicated his thought processes were ramblingly organized; he had no bizarre thought content or delusions; and was oriented to time, date, and place (Tr. 389-90). The claimant's Montreal Cognitive Assessment score was suggestive of some cognitive impairment, but Dr. Ward indicated that substance intoxication could not be ruled out, and that the claimant's effort was marginal (Tr. 390). Dr. Ward's impression was that the claimant:

> appears to be a fairly unreliable historian, and there is some evidence that this claimant may be incompetent to handle any funds awarded. Substance impairment cannot be ruled out today. He reports the bulk of his disability claim is physical impairment, though a psychological overlay to pain experience also cannot be ruled out as he indicates no medical etiology has been discovered.

(Tr. 390). She assessed the claimant with rule out pain disorder, substance abuse, and cognitive disorder (Tr. 390).

The claimant established care with Susan Davis, a physician assistant, on April 14, 2015 (Tr. 417-20). Dr. Davis found normal range of motion, muscle strength, and stability in all of the claimant's extremities with no pain on inspection (Tr. 420). She assessed the claimant with neck pain, knee pain, and cephalgia (Tr. 420). She asked the claimant to notify her when he was financially able to have testing done (Tr. 420).

On November 6, 2015, the claimant presented to Eastar Health System and reported right knee swelling and redness (Tr. 422-30). He was admitted for inpatient treatment of

cellulitis in his right distal thigh, proximal lower leg area, and knee, and was also diagnosed with prepatellar bursitis (Tr. 422-30). The claimant's knee swelling and cellulitis improved significantly with antibiotic treatment, and he was discharged on November 8, 2015 (Tr. 422).

The claimant next sought treatment on April 20, 2016, at the Haskell County Community Hospital Emergency Department (Tr. 441-43). He reported left ankle laxity and frequent sprains (Tr. 441). Physical exam revealed limited range of motion laterally and mild tenderness (Tr. 441). An x-ray taken that day revealed a healed distal tibia fracture with mild posttraumatic deformity and cortical lucencies from removed hardware, but no acute osseous abnormality (Tr. 443).

In September 2015, a state agency psychologist and a state agency physician reviewed the record and determined that the claimant had no severe mental or physical impairments; thus, they did not provide an RFC assessment (Tr. 87-90).

At the administrative hearing, the claimant testified that the most significant reason he was unable to work was his knee pain, which causes him to have trouble standing (Tr. 49). He further testified that he could stand for thirty minutes, sit for about an hour, and would be in pain walking a distance equivalent to a grocery shopping trip (Tr. 50). As to his ankle, he stated that it "gives away," causing him to fall (Tr. 50). The claimant stated that his neck impairment causes his hands to go numb a "couple of times a week," and affects his memory (Tr. 51, 53).

In his written opinion, the ALJ thoroughly summarized the claimant's hearing testimony and the medical evidence (Tr. 25-30). He assigned limited weight to the

opinions of the state agency physician and psychologist (Tr. 29). Instead, the ALJ found the claimant's impairments were severe in light of the cervical MRI and other objective evidence, and that the treatment records tended to show that the claimant's functional limitations were fully consistent with an ability to perform at least a range of light work (Tr. 29). He then spent a great deal of time discussing the claimant's subjective statements and determined that the claimant was not disabled (Tr. 29-30).

The Court agrees that the ALJ erred in formulating the claimant's RFC when he found the claimant could perform a limited range of light work. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e. g.*, laboratory findings) and nonmedical evidence (*e. g.*, daily activities, observations)." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). "When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination." *Jagodzinski v. Colvin*, 2013 WL 4849101, at *2 (D. Kan. Sept. 11, 2013), *citing Brown v. Commissioner of the Social Security Administration*, 245 F. Supp. 2d 1175, 1187 (D. Kan. 2003). In this case, although the record contains evidence of treatment notes, x-rays, and MRIs, there are no physical RFC assessments in the record from a treating physician, a consultative physician, or a state reviewing physician. Instead, the ALJ made his own determination as set forth above. He thoroughly summarized the evidence in the record, but did not cite to any evidence as support for his findings that the claimant could lift and carry up to twenty pounds occasionally and ten pounds frequently, nor how the postural limitations were

decided, or the basis for the sit/stand option. Indeed, the only time those limitations are mentioned are in the recitation of the RFC at the outset of step 4 (Tr. 14-17). The ALJ has thus failed to point to medical evidence demonstrating the claimant can perform light work. "[T]he ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013), *quoting* Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7. A reviewing court may not properly determine how the ALJ reached the RFC determination when the ALJ "merely summarizes" much of the relevant evidence, states that he considered the entire record, "and then announces his decision." *Brant v. Barnhart*, 506 F. Supp. 2d 476, 486 (D. Kan. 2007) [internal quotation marks omitted]. Accordingly, the decision of the Commissioner must be reversed and the case remanded for further analysis of the claimant's RFC.

## Conclusion

In summary, the Court FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The decision of the Commissioner decision is accordingly hereby REVERSED and the case REMANDED for further proceedings consistent herewith.

**DATED** this 26th day of September, 2018.

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**